## Schuhmacher's Estate

Before Van Dusen, P. J., Sinkler, Klein, Bolger, Ladner and Hunter, JJ.

KLEIN, J., hearing judge.—Mary Schuhmacher, testatrix, died November 1, 1945, leaving a will dated September 4, 1940, which was offered for probate by Bernard J. Arndt, executor named therein. Maria Anna McLaughlin, the only child and heir-at-law of decedent, filed a caveat with the register of wills contesting the probate of said will on the grounds:

1. That at the time of the execution of the said writing, and for a long time prior thereto, her mother was not of sound and disposing mind, memory, and

understanding, and therefore lacked testamentary capacity; and

2. That the said writing was procured by duress, constraint, and undue influence practiced upon said testatrix by Bernard J. Arndt, executor, and Elizabeth Schuhmacher, a sister of decedent and aunt of contestant.

A preliminary hearing was held by the register of wills on March 26, 1946, whereupon he certified the original will and record to this court as a disputable and difficult matter, in accordance with section 19 of the Register of Wills Act of June 7, 1917, P. L. 415.

On April 26, 1946, a petition was filed by Bernard J. Arndt, executor, for a citation directed to all parties in interest, to show cause why the register of wills should not be directed to admit the will of decedent to probate because of the failure of contestant to proceed promptly with the prosecution of her appeal. A responsive answer to this petition was filed by Maria Anna McLaughlin, whereupon issue was joined and the matter came on for hearing before me on September 23, 1946.

Extensive testimony was heard from witnesses called by both contestant and proponents, and voluminous documents were offered in evidence in support of the claims of the contending parties.

After a careful study of the entire record, I have reached the conclusion that contestant has failed to substantiate her allegations and that the appeal filed by her must be dismissed.

Mary Schuhmacher, at the time of her death, was a widow, approximately 70 years of age. Her husband, Joseph F. Schuhmacher, died March 27, 1940, which was about five months before the date of the execution of the will in question. Mary Schuhmacher's sister, Elizabeth, was married to Charles Schuhmacher, a brother of Joseph F. Schuhmacher—two sisters married to two brothers. Practically all of the property

constituting the estate of testatrix was inherited by her from her husband, who, in turn, had inherited it from his mother, Anna Maria Schuhmacher, who died in 1928. Maria Anna McLaughlin, contestant, is married, but has no children. Elizabeth Schuhmacher, her aunt, has one child, Anna Elizabeth Carle, who is married, and has six children.

### Analysis of the will

In every case in which the question of testamentary capacity or the allegation of duress or undue influence is presented to the court for determination, it is important to examine the disputed document, itself, to ascertain whether the testamentary scheme is natural and reasonable and in harmony with the family background. Such a study leaves no doubt that Mary Schuhmacher's will is not only normal and reasonable, but, under all the circumstances of this case, provides for a most sensible disposition of her property.

Although the exact amount of testatrix's estate is not set forth in the record, it is obvious from the testimony that it is substantially in excess of $100,000. Testatrix first bequeaths three legacies, totaling $2,000; $500 each to two of her husband's relatives and $1,000 to her own niece. She then gives six gifts to worthy Catholic charities aggregating $2,150. This is followed by an outright gift of $12,000 to her daughter, contestant. The balance of her estate is placed in trust, with the provision that her brother, John M. Bauerlein, receive $15 a week for the term of his life, with the further provision that the entire balance of the income should go to her daughter, Maria Anna McLaughlin, as long as her husband is living. If the daughter survives her husband, she is to receive the principal of the residuary estate, subject only to the payment of $15 a week to testatrix's brother. In the event that the daughter predeceases her husband, the residuary estate is to be distributed equally among the children of Anna Elizabeth Carle, who was a niece of both testatrix and

her husband and, next to contestant, the closest living relative of testatrix's husband, Joseph F. Schuhmacher, under whose will testatrix received this estate.

The record also discloses that Maria Anna McLaughlin received from the estate of her father a gift of $2,000. She also received an outright gift of $5,000 in Government bonds, which testatrix had purchased and held in trust for her.

Obviously, the will was carefully designed to make certain that Frank D. McLaughlin, son-in-law of decedent, should not receive any part of her estate directly. Maria Anna McLaughlin is 41 years of age, and has been married for 18 years. It appears from the testimony that, by reason of her physical condition, it is improbable that she will ever have children of her own. Testatrix undoubtedly knew of this, because the will directs that in the event the daughter predeceases her husband the remainder is to be distributed among the children of Anna Elizabeth Carle, the niece, making no reference to the possibility of the daughter's having issue.

### *Antipathy toward Frank D. McLaughlin, the son-in-law*

There can be little doubt, from a study of the testimony in this case, that Joseph F. Schuhmacher, testatrix's deceased husband, opposed the marriage of his daughter, Maria, to Frank D. McLaughlin, and that he had no kindly feeling for McLaughlin. It is also clear that testatrix shared her husband's dislike of the son-in-law. This fact is substantiated by proponent's witnesses and by two of contestant's own witnesses, John A. Bearkey and Maria Ehrhart. Of much more significance, however, than the testimony of the witnesses were two papers, in the handwriting of Joseph F. Schuhmacher, produced by proponents and offered in evidence, which were evidently drafts of wills which he prepared. In the one he stated: "If my daughter

should die before her husband, nothing to go to his relations but to my sister-in-law's children", and in the other he stated: "Should my daughter die before her husband is only to receive $500. No one on her husband side are not receive anything." The husband, instead of making these provisions in his will, left his entire estate to his wife, with the exception of gifts of $2,000 to his daughter and of $1,000 to the St. Vincent's Orphan Asylum.

It seems clear that testatrix intended to carry out substantially the wishes of her husband in the ultimate distribution of the money which she inherited from him. The testamentary plan under testatrix's will is, with slight modifications, virtually the plan outlined by her husband in his memoranda. This circumstance is one of the most compelling arguments against the daughter's attack on her mother's will.

### Allegation of undue influence

The entire record is bare of any testimony to support the charge that this will was obtained as a result of duress or undue influence practiced upon testatrix. The will was executed in the office of Bernard J. Arndt, a real estate broker who was a lifelong friend of both testatrix and her husband. He attended the same school as testatrix, and maintained close social relations with the family thereafter until her death. He attended to the real estate affairs of testatrix and her husband, and of other members of the Schuhmacher family for many years.

The testimony discloses that testatrix, accompanied by her sister, Elizabeth Schuhmacher, came to Mr. Arndt's office in the early part of April 1940, shortly after her husband's death, and requested him to make a will for her. At that time she told him what she wanted in her will and referred to the memoranda of her husband, to which reference has heretofore been made. Mr. Arndt made a penciled draft of testatrix's

instructions, and then advised her to think it over and let him know if there were any changes she wished to make.

Several months later, in August 1940, decedent came to Mr. Arndt's office and said she had carefully considered what she wanted in her will and instructed Mr. Arndt to have Theodore E. Nichterlein, the family attorney, prepare the will. Mr. Nichterlein had been a friend and attorney for the Schuhmacher family for many years. Mr. Arndt then sent his penciled draft to Mr. Nichterlein, who, early in September 1940, prepared a typewritten draft of the will. Mr. Arndt then took this draft to the home of decedent and showed it to her. She read it and said it was just what she wanted. Mr. Arndt then sent the draft back to Mr. Nichterlein and told him to prepare the will. Mr. Nichterlein prepared an original and duplicate will and sent them to Mr. Arndt, who thereupon asked decedent to come to his office to sign them. On September 4, 1940, she came to his office again, unaccompanied by her sister, Elizabeth, or any other person. She read the will, and in the presence of Mr. Arndt, his wife, Leona Klinger Arndt, and his secretary, Frances Helen Nelson (now Wolfinger), executed the will. Miss Nelson and Mrs. Arndt acted as subscribing witnesses.

Both Mr. and Mrs. Arndt appeared as witnesses before me. They testified in a straightforward, direct, and convincing manner, and I was impressed with their truthfulness. Miss Nelson, who is now married, appeared before the register of wills, but she did not appear before me as she was expecting the arrival of a baby and was forbidden by her doctor to appear in court. However, counsel for the parties in interest entered into a stipulation agreeing that the testimony given by her before the register of wills should be admitted in evidence before me with the same force and effect as if she had appeared in court. Her testimony substantiates that of the Arndts in all material

respects. Their unchallenged and uncontradicted testimony clearly establishes that neither Mr. Arndt, nor testatrix's sister, Elizabeth Schuhmacher, exercised any duress or undue influence in procuring the execution of this will.

It must be borne in mind that Mr. Arndt and the two subscribing witnesses are completely disinterested, since they receive no benefit of any kind under the will. It is true that Mr. Arndt is named executor and trustee, but there is nothing to suggest that he would not also have been named executor if the estate had been left outright to contestant. It is certainly far-fetched and highly improbable to assume that the slight added advantage which he would receive by reason of acting as trustee would tempt this trusted advisor of the Schuhmacher family to impose his will upon testatrix. It is true that the grandchildren of Elizabeth Schuhmacher receive the residue of this estate in the event contestant dies in the lifetime of her husband, but nothing has been shown from which a conclusion can fairly be drawn that Elizabeth Schuhmacher had any part in the preparation of this will, and it is clear that she was not present when the will was executed. As a matter of fact, the testimony of contestant suggests that her motivating purpose in imputing improper conduct to Mr. Arndt and her Aunt Elizabeth was her keen disappointment in not being able to lay her hands immediately upon the entire principal of her mother's estate. Her testimony in support of the averments of her petition was naive and completely unsupported in fact.

I am entirely satisfied, and find as a fact, that Mary Schuhmacher, testatrix, executed this will of her own free volition and choice, completely free from any duress or undue influence exercised by Bernard J. Arndt, Elizabeth Schuhmacher, or any other persons, and that by this will she carried out her clear and determined purpose to distribute the estate which she

received from her husband pursuant to his wishes, as expressed by him in the memoranda which he prepared in his lifetime.

### *Testamentary capacity*

In support of her attack upon her mother's will, Maria Anna McLaughlin, in addition to testifying herself, called as witnesses her husband, Frank D. McLaughlin, Dr. E. Sherman Clouting, a specialist in mental diseases, and 10 other witnesses. These witnesses consisted of decedent's neighbor's, several relatives of her husband, and a woman, Josephine Bartel, who had taken care of testatrix for a period of approximately seven weeks following her husband's death. Their testimony is all directed towards attempting to establish that at the time of the execution of the will Mary Schuhmacher, testatrix, was of unsound mind.

It seems clear from their testimony that except for a short period in 1915, which will be discussed more fully later, Mary Schuhmacher was a normal, rational person prior to March 27, 1940, the date of her husband's death. It also seems clear that, after having lived a lifetime with her husband, she was tremendously upset emotionally by his death, and that she was extremely unhappy and grief stricken. The one manifestation upon which all of contestant's witnesses seem to agree, and which she apparently regards as the strongest evidence of her mother's mental incapacity, is the fact that she constantly requested her neighbors, the trades people with whom she dealt, and her friends to pray for her. There cannot be the slightest doubt that testatrix was a devout Roman Catholic, imbued with a strong faith in the teachings of her religion and the emphasis it places upon the efficacy of prayer. There also can be little doubt that her fervor was so great, that her constant endeavors to have other people pray for her, caused them to regard her as peculiar and eccentric.

There was further testimony concerning other peculiarities which developed in testatrix following her husband's death. There was testimony to the effect that she would write down the serial numbers of all paper money which passed through her hands. When riding in trolley cars, she would take down the number of the motorman. In her home she would take the wrappers off tin cans and save them in a drawer, and her neighbor, Mr. Bearkey, testified that he saw her remove the contents from her garbage container. I must state at this point that much of the testimony of contestant's witnesses was contradictory and, in some cases, obviously tinged by self-interest or, as in the case of two of the relatives of testatrix's husband, by disappointment. But even if all of this is taken at face value, it falls far short of establishing testatrix's lack of testamentary capacity.

The testimony of both contestant's and proponents' witnesses clearly establishes that testatrix, at the time she executed this will, was familiar with the extent of her property and the natural objects of her bounty. Although she complained on many occasions of the heavy responsibility which had been placed upon her in managing the substantial estate left to her by her husband, she did take care of her property intelligently, normally, and successfully. The evidence is clear and uncontradicted that she acted as executrix of her husband's estate and wound up the affairs of this estate satisfactorily. She maintained a separate bank account upon which she drew checks. Many of these checks, including a number made at or about the time of the execution of the will, were entirely in her own handwriting. She also attended church regularly, read the newspapers and listened to the radio daily, attended social functions, made regular contributions to the charities in which she was interested, visited her friends and relatives, played cards, and engaged in other normal social relationships.

There can be no doubt that upon her husband's death she was grief stricken and lonely, but in this period of great stress her only daughter failed her. The daughter's testimony indicated that she was not intimate with her mother and that although she lived close by and frequently received substantial gifts of money from her, she visited her only occasionally following the death of her father. Obviously this contestant was not a thoughtful and considerate daughter. Testatrix apparently realized that she could place little reliance upon the judgment and discretion of her daughter. It also seems clear that she could not depend upon the business judgment of her son-in-law, who appears from the testimony to have been a salesman, earning only a marginal wage, and admittedly without experience in financial matters. She must have considered that, under these circumstances, she would afford her daughter greater protection by leaving her only the income, rather than to give her the entire principal outright in the lifetime of her husband.

Learned counsel for contestant, in support of his position, stresses the fact that in 1915, 30 years prior to her death, testatrix was a patient for a period of approximately five months in the Pennsylvania Hospital.

It appears from the hospital record, which was offered in evidence, that prior to her admission to the hospital she had been pregnant and had, by her own conduct, purposely brought about a miscarriage. After the abortion occurred, she became self-accusatory and mentally ill. The hospital record indicates that the diagnosis of her illness was manic-depressive psychosis. She was discharged from the hospital on October 3, 1915, as "much improved". The report further shows that as of December 12, 1919, the patient had suffered no recurrence of her mental trouble, and again on November 6, 1920, that she continued in good condition. Except for some unconvincing testimony by contestant

herself, it does not appear that testatrix suffered any recurrence of this mental illness at any time during the 25 years which elapsed between the date of her discharge from the hospital and the time she executed the will.

Dr. E. Sherman Clouting, a specialist in mental diseases, testified on behalf of contestant. He stated that he examined testatrix at her residence on December 23, 1940, and again on April 23, 1945. He said that he found her profoundly distressed and greatly agitated and that she had a manic-depressive melancholia of the agitated type. He explained, however, that patients suffering attacks from this disease recover and are normal until they suffer another attack. He said: "There is no regular pattern. They usually recover from an attack. It is a most benign psychosis if we have a recovery. . . ." Dr Clouting refused, however, to venture an opinion as to the mental condition of testatrix in September 1940, at the time the will was executed. Since the doctor's testimony, in effect, was that persons suffering from this disease are normal between attacks, and since he refused further to express an opinion as to testatrix's mental condition at the time the will was executed, little weight can be given to his testimony.

In passing, it is significant to note that testatrix's family physician, Dr. Rilling, who treated her from time to time, both before her husband's death and afterwards, was not called by contestant.

Bernard J. Arndt, executor, and Leona Klinger Arndt, and Frances Nelson Wolfinger, the subscribing witnesses, were unanimous in their testimony that at the time the will was executed testatrix appeared to be a person of sound mind, fully aware of what she was doing and the manner in which she wished her estate to be distributed.

Proponents called Charles F. Gerhart, a reputable member of the Philadelphia bar, who testified that he

knew testatrix in 1940 and 1941. He stated that she was a member of an organization of which he was president, that this organization met twice a month, and that on numerous occasions he spoke to testatrix. He stated that he at no time had any doubt that testatrix was of sound and disposing memory in September 1940.

Theodore E. Nichterlein, the family attorney, was also called as a witness by proponents. He testified that he had known testatrix since 1900. He further stated that she came to his office on April 2, 1940, and at that time she signed a petition for letters testamentary upon the estate of her deceased husband, Joseph F. Schuhmacher, after he had read the petition to her and discussed with her the assets of the estate. At that time she indicated that she knew the value of these assets and displayed a keen knowledge of the details of her husband's estate. He stated, further, that, in his opinion, testatrix was of sound and disposing mind and memory in April 1940.

I do not regard the fact that testatrix was a patient at the Pennsylvania Hospital in 1915 as of much moment in deciding the issues in this case, nor can I place much reliance on the testimony of Dr. Clouting. All of the material testimony of the witnesses of both proponents and contestant clearly indicates that testatrix was of sound mind at the time she executed her will, and that she was possessed of testamentary capacity, being fully aware of the extent of her property and the natural objects of her bounty.

I therefore find as a fact that on September 4, 1940, the day upon which testatrix executed her will, she was a person of sound mind, memory and understanding, and possessed of testamentary capacity.

The law is well settled that when a will is executed properly in every particular there is a presumption of testamentary capacity and lack of undue influence, which places upon contestant the burden of producing

compelling evidence in her effort to upset the will: Ross Will, 355 Pa. 112, citing Olshefski's Estate, 337 Pa. 420, 422, 11 A. (2d) 487; Wertheimer's Estate, 286 Pa. 155, 160, 133 A. 144; Lawrence's Estate, 286 Pa. 58, 64, 132 A. 786; Grubbs v. McDonald, 91 Pa. 236, 241.

With this burden upon her, contestant has failed to offer any substantial proof in support of either of her basic allegations. Quoting from Ross Will, supra (p. 117):

"From what we have said it should be evident that the contestant failed to make out a prima facie case. . . . It is only where a contestant's proofs raise a substantial dispute as to a material matter of fact, which is not overcome in the mind of the hearing judge by the quantum and character of the proofs adduced by the proponent, that the award of an issue is justified: Doster's Estate, 271 Pa. 68, 72, 113 A. 831; Tetlow's Estate, 269 Pa. 486, 494, 112 A. 758; Phillips' Estate, 244 Pa. 35, 42, 90 A. 457."

There can be little question that both testatrix and her husband were prejudiced against their son-in-law, Frank D. McLaughlin. This fact undoubtedly motivated the testamentary plan adopted by testatrix which the daughter regards as unnatural. An analogous situation confronted the court in Morgan's Estate, 219 Pa. 355 (1908), in which Chief Justice Mitchell said at p. 357:

"Testator had an only child, a daughter, whom he passed over and gave the bulk of his estate to her two children, and it is argued from this that the will is an unnatural one and evidence of undue influence. But a will is unnatural in a legal sense only when it is contrary to what the testator *from his known views, feelings and intentions would have been expected to make. When it is in accordance with such views it is never unnatural, however much it may differ from the ordinary actions of men in similar circumstances.*

In the present case it was shown that the testator had a prejudice against his son-in-law and that his reason for passing over his daughter was to avoid the probability of the estate coming into the hands or management of her husband. It is conceded that the prejudice was without any just foundation, but just or unjust its existence explains the testator's action and deprives it of all weight as evidence of mental incompetency. As said by Paxson, J., in Cauffman v. Long, 82 Pa. 72 . . . 'a man's prejudices are a part of his liberty.' " (Italics supplied.)

To the same effect see Brennan's Estate, 312 Pa. 335 (1933); Aggas v. Munnell et al., 302 Pa. 78 (1930); Mark's Estate, 298 Pa. 285 (1929); Koons's Estate, 293 Pa. 465 (1928).

The fact that testatrix may have acted in an eccentric manner does not establish that she lacked testamentary capacity: Kish v. Bakaysa et al., 330 Pa. 533 (1938); Lawrence's Estate, 286 Pa. 58 (1926). Nor has a scintilla of evidence been produced which indicates that her religious beliefs in any way affected the terms of her will: Guar. T. & S. D. Co. v. Heidenreich et al., 290 Pa. 249 (1927). Even a casual reading of this will dispels any suspicion that testatrix's religious fervor or peculiar conduct influenced or affected her testamentary plan.

The facts appearing of record clearly establish that testatrix directed Mr. Arndt, a trusted friend and adviser, to have her will prepared in accordance with the provisions of written memoranda prepared by her husband, from whom she inherited her property. It was further established beyond question that the will was prepared by Mr. Nichterlein, another friend of many years standing and also attorney for the family. The will was executed in the presence of Mr. Arndt and the subscribing witnesses, who were all disinterested and whose testimony leaves no doubt that testatrix was

of sound mind and free from duress or undue influence at the time the will was executed.

Any burden which may have been placed upon proponents, by reason of testatrix's confinement in the mental hospital in 1915, to show that she possessed testamentary capacity in 1940, when the will was executed, has been met fully. Furthermore, the will is a natural one, contestant being the principal beneficiary; no stranger, having any part in the preparation of the will, receives any benefits thereunder. This circumstance must be regarded as strongly favoring the validity of the will. See Snyder's Estate, 279 Pa. 63 (1924), and the other cases cited in Hunter's Pennsylvania Orphans' Court Commonplace Book, Vol. 1, p. 220.

Not only did contestant's case fail to raise a substantial dispute as to a material fact; proponents' evidence overwhelms any imputation of want of testamentary capacity or presence of fraud and undue influence. After a careful consideration of all of the facts I am firmly of the opinion that a verdict in favor of petitioning contestant would have to be set aside as against the weight of the evidence. The request for an issue must therefore be denied: Ross Will, supra. See also Lare Will, 352 Pa. 323 (1945).

I have therefore concluded that no issue should be awarded. . . .

*Edward A. Hosey, Jr.*, for exceptant.

*Theodore E. Nichterlein* and *Henry Arronson*, contra.

SINKLER, J., March 21, 1947.—The exceptions, 17 in number, are summarized in the statement of questions involved presented in the brief of contestant: (1) Whether decedent had testamentary capacity when she gave instructions for the preparation of her will; likewise when she executed it. (2) Where prior incompetency is shown, whether the burden rests upon proponents to establish testamentary capacity and the

absence of undue influence when the will was prepared and executed, and is the burden overcome through the testimony of decedent's confidential adviser, who is appointed executor and trustee, and that of his wife; likewise that of his two employes who acted as attesting witnesses to the will. (3) Whether the evidence discloses such a substantial dispute as to warrant the granting of an issue devisavit vel non. The first two questions were answered by the hearing judge in the affirmative; the third, in the negative.

The notes of testimony of the witnesses heard by the register of wills, as well as those who appeared before the hearing judge, have been read and considered; likewise the briefs of argument submitted in behalf of proponents and contestant. We are convinced that the conclusions reached by the hearing judge upon the three questions are undoubtedly correct. The findings of fact of the hearing judge are correct; likewise his conclusions of law. His opinion contains a full recital of the facts and circumstances; likewise an analysis of the applicable decisions. The will he finds to be a natural one, designed to give testatrix's daughter the income for the life of the trust estate created by the residue of her estate, should the daughter not survive her husband; the principal after his death, should he die before her. The purpose of these provisions the learned hearing judge finds was to prevent her son-in-law from ever enjoying any part of her estate. He finds that testatrix and her husband, from whom she inherited her entire estate, both had strong antipathy for contestant's husband.

It is not necessary to rephrase or summarize his opinion. Reference is made only to his finding respecting the testimony of Dr. E. Sherman Clouting, a specialist in mental diseases, called by contestant. The will was executed September 4, 1940. He examined testatrix at her residence on December 23, 1940, and again on April 23, 1945. He found her, the hearing

judge continues, "profoundly distressed and greatly agitated and that she had a depressed melancholia of the agitated type." He testified, however, that persons suffering from this ailment are normal after recovery until another attack occurs. A distinction is made, we take it, between this form of melancholia and a chronic mental ailment where the patient had lucid intervals.

The learned hearing judge recited that the witness refused to express an opinion respecting the mental condition of testatrix at the time the will was executed, and little weight can be given to his testimony. The hearing judge comments upon the fact that testatrix's family physician, who attended her before and after her husband's death, was not called by contestant.

The decree at the end of the opinion is correct in every respect and we concur with the direction therein to the register of wills to admit to probate, as the last will and testament of Mary Schuhmacher, the instrument that is before us.

The exceptions are dismissed and the opinion of the hearing judge affirmed.